J-A02035-19

2019 PA Super 60

| | | |
|---|---|---|
| J.L. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| A.L. AND K.L. | : | |
| | : | |
| Appellants | : | No. 945 MDA 2018 |

Appeal from the Order Entered May 29, 2018
In the Court of Common Pleas of Dauphin County Civil Division at No(s):
2018-CV-1700-MD

BEFORE: LAZARUS, J., DUBOW, J., and NICHOLS, J.

OPINION BY NICHOLS, J.:                    **FILED FEBRUARY 26, 2019**

A.L. and K.L. (Mother and Husband) (collectively, Appellants), appeal from the order granting J.L.'s (Father) complaint to establish paternity and directing that E.J.L.L. (Child), born in January 2018, be made available for genetic testing. Appellants contend that the trial court erred by concluding they did not have an intact marriage and family when Father filed his complaint. After careful review of the entire record, we affirm.

The relevant procedural and factual history are as follows. Appellants married in 2009 and are the parents of a daughter, J.L., born in October 2012. N.T. Trial, 5/7/18, at 129-30. Subsequently, between 2016 and 2017, Mother had two nonviable pregnancies. *Id.* at 131-32. This strained Appellants' marriage. *Id.* at 132, 209-10. While Appellants participated in both individual

and joint counseling,[1] *id.* at 132, 138, 209-10, they never divorced or filed for divorce and allegedly continued to have a sexual relationship. *Id.* at 135, 230. Appellants continued to celebrate holidays and vacation together. *Id.* at 144, 227; *see also* Appellants' Ex. 11. Upon the advice of their counselor, they did, however, obtain a separate apartment in September 2017. N.T. Trial, 5/7/18, at 139-40; *see also* Appellants' Ex. 5.

Meanwhile, Mother met Father at a wedding in March 2017, and began an affair, which lasted until February 2018. N.T. Trial, 5/7/18, at 133-34. Mother informed Father that she and Husband had been separated since November 2016.[2] N.T. Trial, 5/4/18, at 14. Moreover, Mother and Father frequently discussed her strained relationship with Husband. Although Mother never indicated that she had filed for divorce, Mother referenced divorce on numerous occasions. N.T. Trial, 5/7/18, at 173-74; N.T. Trial, 5/4/18, at 17, 22, 24-25; *see also* Father's Ex. 1. Mother admitted that she lied to and concealed things from both Husband and Father throughout the course of her nearly one-year affair with Father. *See, e.g.*, N.T. Trial, 5/17/18, at 351; N.T. Trial, 5/7/18, at 134, 144, 148, 153, 173, 187-89, 204, 217. Mother

---

[1] Husband also began taking medication around June of 2017. N.T. Trial, 5/7/18, at 140-41, 211.

[2] Father testified that he would have never pursued or continued a relationship with Mother if she were not separated, as he came from a broken home, and due to his religious and moral beliefs. N.T. Trial, 5/4/18, at 22, 62.

acknowledged that during this period of time, she was essentially "living a double life." N.T. Trial, 5/7/18, at 196.

The trial court recounted the facts:

Mother learned she was pregnant in May of 2017, and all three parties participated in a prenatal paternity test, which indicated that there was a ninety-nine percent (99%) chance that Father was the [c]hild's biological father.[3]

Upon learning of the results of the paternity test and until the filing of [Appellants'] Answer in this matter, Mother's actions confirmed that Father was the biological father of the [c]hild.[4] Father assumed all responsibilities of an expectant [f]ather and along with Mother, prepared for the [c]hild's birth. Mother and Father discussed naming the [c]hild, purchased clothing and other items for the [c]hild and visited potential daycare centers for the [c]hild. Father attended a pre-natal visit with Mother and attended two of the [c]hild's pediatrician visits after the [c]hild was born in January of 2018.

Throughout the pregnancy, Mother and Father continued their familial and romantic relationship. At times, Mother included her five[-]year-old daughter in their times together. The expectant couple posted photographs of themselves together on social media and went on several trips together. Mother visited Father

_____

[3] This paternity test was taken in July or August 2017. N.T. Trial, 5/7/18, at 137; N.T. Trial, 5/4/18, at 86. Mother advised Husband of the pregnancy in May, but did not advise him of her relationship with Father and the potential question of paternity until June. N.T. Trial, 5/7/18, at 134, 136. Mother, however, explained to Father that she did not maintain an intimate relationship with Husband, but had mistakenly slept with Husband on one occasion. N.T. Trial, 5/17/18, at 300-01; N.T. Trial, 5/4/18, at 38, 43.

[4] Both Mother and Husband acknowledged that Father was the child's biological father. N.T. Trial, 5/7/18, at 184-85, 201-02, 213.

almost weekly at his home in State College. . . .[5] The couple regularly presented themselves as being in an intact relationship and often engaged in public displays of affection. Father introduced Mother to his family, colleagues and friends as his girlfriend, a fact which Mother did not dispute.

During her relationship with Father, Mother continued to maintain that she was separated from Husband and that she was working toward divorcing Husband as they worked on a shared custody arrangement for their five[-]year[-]old daughter.[6] Mother noted that the parties maintained a second residence where the non-custodial parent could reside, allowing the [c]hild to remain in the marital home.[7] When the lease on the second residence expired, in December of 2017, Mother rented an apartment in her name alone to facilitate separation from Husband,[8] after which she referred to the marital residence as "[Husband]'s house." Father and a friend of his helped Mother move into the apartment,

---

[5] Father additionally made some trips to Harrisburg, and Mother and Father occasionally met between State College and Harrisburg. N.T. Trial, 5/4/18, at 16, 33.

[6] Around October or November 2017, Mother advised Father that Husband wished to reconcile and expressed her desire for space. N.T. Trial, 5/7/18, at 142, 146; N.T. Trial, 5/4/18, at 24-25, 82-83.

[7] Mother advised Father that she and Husband had secured a one-year lease for this apartment when it was actually only a three-month lease beginning in September 2017. N.T. Trial, 5/4/18, at 48, 73-74; **see also** Appellants' Ex. 5.

[8] Testimony was presented that the leasing company's policy required that the marital residence and additional apartment could not both be leased in both Mother's and Husband's names. N.T. Trial, 5/7/18, at 199-200; N.T. Trial, 5/4/18, at 8. Mother testified that the second apartment was obtained in December 2017, again upon the recommendation of her and Husband's marriage counselor, in an effort to afford time and space, and in order to facilitate the logistics of Father's visitation with Child upon her birth. N.T. Trial, 5/7/18, at 145-46.

moving items from the marital home to Mother's apartment,[9] including, but not limited to a bed for Mother, a bed for the five[-]year[-]old daughter, Mother's nursing chair and clothes of Mother's and her daughter. By Mother's own admissions, Father assisted in decorating the apartment and furnishing it for the arrival of their [c]hild.

While Father was not at the hospital for the birth, he did leave his conference in Philadelphia when Mother notified him she was going into labor. Father did stay with Mother in the recovery room and spent at least one overnight with Mother and their newborn at the hospital. The [c]hild's birth certificate includes Father's surname. . . .[10]

Trial Ct. Op., 7/31/18, at 2-4.

Following Child's birth, Father introduced Child to friends and colleagues, and attended two pediatric appointments. N.T. Trial, 5/17/18, at 305-07; N.T. Trial, 5/7/18, at 184-85, 194, 205-06; N.T. Trial, 5/4/18, at 28; *see also* Father's Ex. 11. At Child's first pediatric appointment, Father provided his medical insurance.[11] N.T. Trial, 5/4/18, at 57-59. Father additionally posted with regard to Child and her birth on social media, to which Mother openly responded. N.T. Trial, 5/7/18, 192-94; N.T. Trial, 5/4/18, at

---

[9] Husband was present when Father and his friend moved the items from the marital home. N.T. Trial, 5/4/18, at 50.

[10] As indicated, Mother and Father had discussed names for Child. Father's last name was included as a second middle name. In addition, Child's first middle name is Father's grandmother's name. N.T. Trial, 5/17/18, 308-09; N.T. Trial, 5/4/18, at 44-45, 62; *see also* Father's Ex. 6.

[11] Mother, however, subsequently placed Child on her own medical insurance, along with herself, Husband, and J.L. N.T. Trial, 5/7/18, at 201-02.

55-56; *see also* Father's Ex. 11. Likewise, Appellants, with guidance from J.L.'s counselor, explained Child's parentage to J.L.[12] N.T. Trial, 5/7/18, at 222, 246.

> Father regularly visited Mother and the [c]hild at Mother's apartment and in public places, as Mother and Father continued their romantic relationship until February 21, 2018. The record is clear that it was at this time that Mother notified Father that she was reconciling with Husband to allow the [c]hild and Mother and Husband's five[-]year[-]old to be together as sisters. After this date, Mother unilaterally decided to stop Father's visit[s] with the [c]hild and encouraged [Father] to commence legal action to be recognized as the [f]ather of the [c]hild.[13]

Trial Ct. Op., 7/31/18, at 4-5.

The record establishes that Husband was present in the operating room with Mother when Child was delivered and was named as Child's father on the birth certificate. N.T. Trial, 5/7/18, at 220; *see also* Appellants' Ex. 6. Husband testified that he was unaware until several weeks prior to trial that Mother's and Father's sexual relationship continued until February 2018. *Id.* at 216-17. He indicated that his relationship with Mother strengthened in particular after a trip to New Orleans in November 2017. *Id.* at 224. He and Mother held Child out as their own to the religious community and otherwise by having two Jewish baby naming ceremonies and posting and sending birth

---

[12] Testimony was presented that J.L. was told that Child had "two daddies." N.T. Trial, 5/7/18, at 222, 246.

[13] Father testified that he was permitted a visit with Child on March 20, 2018. N.T. Trial, 5/4/18, at 60.

announcements. N.T. Trial, 5/7/18, at 157-58, 168, 228-30; *see also* Appellants' Exs. 4, 13. Husband testified that Father's visitation with Child became burdensome and that the situation created stress for the family. N.T. Trial, 5/7/18, at 223. Husband further stated that Father's continued involvement with Husband's family could be problematic. *Id.* at 251-52.

On March 9, 2018, Father filed a complaint to establish paternity and for genetic testing, to which Appellants responded, in part, that they had never separated. The court conducted a hearing on Father's complaint over the course of three days: May 4, 7, and 17, 2018. Appellants, as well as Father, were present and represented by counsel and all testified on their own behalf and submitted exhibits, which the court admitted. Father additionally presented the testimony of Isabel Dupeles, business manager at R.P. Management (the company responsible for the administration and management of the apartment complex where Appellants reside in Harrisburg), and friends, J.B.U. and J.M.P. Appellants presented the testimony of N.R.E. (Maternal Grandmother), and friends, M.C.R. and S.H.

In relevant part, Husband's testimony revealed his willingness and desire, regardless of the circumstances, to maintain his marriage with Mother:

> [Husband's counsel:] . . . So given this -- we've got learning of an affair, learning that there's a pregnancy that may not be yours, learning that the pregnancy biologically is not yours, learning that your wife's sexual relationship continued with -- and her extramarital affair longer than you thought, why are you still here?
>
> [Husband:] Because I love my wife. And we have 14ish years of history together, and we had been through some major traumas.

We were both hurting in the deepest ways. We both coped with that in extraordinarily unhealthy ways. And I knew that this woman who I was with over the course of the last couple years was not the person that I married, but I knew also that the person that I married was very much still there. And perhaps I'm sort of a hopeless romantic in some ways, but I felt almost like if I stayed there and stuck with everything and to some extent sort of waited it out and just kind of was there for her and [J.L.] and now [Child] on a daily basis, that we could get through all of this just awfulness and emerge stronger in the end.

And I mean, that's why, you know, this whole time we've been in marriage counseling despite all the lies and despite the deception and misconceptions and lack of information and then lots of information. I love [Mother] too much to give up because we -- we fell in love with each other for a reason.

N.T. Trial, 5/7/18, at 218.

Despite their problems, Husband testified that he never felt their marriage was irretrievably broken. *Id.* at 225. While the continued sexual relationship between Mother and Father bothers him, Husband observed that his and Mother's relationship has evolved and is at a point where they can deal with the situation in a more mature way. *Id.* at 224-25. Husband further testified as follows:

[Husband's counsel: A]t this point in time or at any point in time have you felt like you wanted to separate or file for divorce?

[Husband:] At no point have I felt like I wanted to really separate or file for divorce. You know, certainly in the discussions for apartments, the idea of separation came up. But it wasn't really something in the end that we ever really felt like we could act upon, if not for our [own] sakes, then certainly for [J.L.]'s sake, and for [Child]'s sake. You know, I feel that sort of in the heat of the moment is when this sort of inner strength of our relationship that's always been there throughout 14 years of a relationship and almost nine years of marriage really has come out.

*Id.* at 225-26.

On May 29, 2018, the court ordered that Child be made available for genetic testing, to be arranged and paid for by Father, within twenty days. On June 8, 2018, Appellants filed a timely notice of appeal, as well as a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Appellants then filed a motion to stay the May 29th order, which the trial court denied on June 12, 2018. Appellants filed an emergency application for *supersedeas* with this Court, which we granted on June 14, 2018. The trial court filed a Pa.R.A.P. 1925(a) opinion.

On appeal, Appellants raise the following question for our review:

> 1. Did the lower court err by not applying the presumption of paternity in favor of [Appellants] where the undisputed evidence demonstrated that they maintained an intact marriage and family at the time [Father] filed his complaint?

Appellants' Brief at 3.

Appellants argue that the presumption of paternity is irrebuttable when there is significant evidence of record of an intact marriage. Appellants assert, "[t]he undisputed facts in this case overwhelmingly established that [Appellants] and the [c]hild (along with her sister) remained in an intact family at the time of [Father]'s paternity challenge and through the present day, and that Husband and Wife remain in an intact marriage." *Id.* at 9. Appellants point to the following: (1) the fact that they remained married and never filed for divorce; (2) Husband failed to change his Facebook status from married;

(3) Husband attended prenatal appointments and was present at Child's birth; (4) Husband was named on Child's birth certificate; (5) Appellants took part in photo shoots pre- and post-birth; (6) Appellants sent birth announcements after Child's birth; (7) Appellants maintained joint banking accounts and filed taxes jointly; (8) Appellants maintained joint automobile and property insurance policies; (9) Appellants celebrated holidays and vacationed together; (10) Appellants participated in religious ceremonies with respect to Child; (11) Husband provides for Child's daily needs and expenses; and (12) Appellants hold Child out as their child. *Id.* at 9-11. Appellants liken their case to *E.W. v. T.S.*, 916 A.2d 1197 (Pa. Super. 2007). *Id.* at 12. Further, Appellants maintain that there is nothing to suggest that their presentation of an intact marriage is "suspicious," as suggested by the trial court. *Id.* at 13. Lastly, Appellants assert that it was error for the trial court to make a determination rooted in credibility and challenge the court's reliance on Mother's lack of credibility. *Id.* at 16-17.

We review the trial court's order with regard to paternity for an abuse of discretion or error of law. *Barr v. Bartolo*, 927 A.2d 635, 639 (Pa. Super. 2007).

With regard to this standard, we have stated:

An abuse of discretion exists if the trial court has overridden or misapplied the law, or if there is insufficient evidence to sustain the order. Moreover, resolution of factual issues is for the trial court, and a reviewing court will not disturb the trial court's findings if they are supported by competent evidence. It is not

enough [for reversal] that we, if sitting as a trial court, may have made a different finding.

***Vargo v. Schwartz***, 940 A.2d 459, 462 (Pa. Super. 2007) (brackets in original and citation omitted).

Further, "[t]he finder-of-fact is entitled to weigh the evidence presented and assess the credibility of witnesses. The finder-of-fact is free to believe all, part, or none of the evidence, and this court will not disturb the trial court's credibility determinations." ***B.S. v. T.M.***, 782 A.2d 1031, 1037 (Pa. Super. 2001) (citations omitted); ***accord E.W.***, 916 A.2d at 1202.

The analysis required for a legal determination of paternity has been summarized as follows:

> [F]irst, one considers whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity. If the presumption has been rebutted or does not apply, and if the facts of the case include estoppel evidence, such evidence must be considered. If the trier of fact finds that one or both of the parties are estopped, no blood tests will be ordered.

***Brinkley v. King***, 701 A.2d 176, 180 (Pa. 1997) (plurality).

Under the law of presumptive paternity, "generally, a child conceived or born during the marriage is presumed to be the child of the marriage; this presumption is one of the strongest presumptions of the law of Pennsylvania; and the presumption may be overcome by clear and convincing evidence . . . ." ***Id.*** at 179 (footnote omitted). This presumption, however, applies only

where the underlying policy of the presumption, *i.e.*, to preserve marriages, would be advanced by its application. ***Id.*** at 181; ***see B.S.***, 782 A.2d at 1035 n.3.

Turning to paternity by estoppel, this doctrine has been defined as follows:

> Estoppel in paternity actions is merely the legal determination that because of a person's conduct (e.g., holding out the child as his own, or supporting the child) that person, regardless of his true biological status, will not be permitted to deny parentage, nor will the child's mother who has participated in this conduct be permitted to sue a third party for support, claiming that the third party is the true father. As Superior Court has observed, the doctrine of estoppel in paternity actions is aimed at "achieving fairness as between the parents by holding them, **both** mother and father, to their prior conduct regarding the paternity of the child."

***Freedman v. McCandless***, 654 A.2d 529, 532-33 (Pa. 1995) (citation and footnote omitted).[14]

In ***B.S.***, B.S. had an affair with T.M. while married to R.S. Shortly after learning she was pregnant, B.S. separated from and moved out of her home with R.S. B.S. expressed her desire for a future with T.M. and even looked

_____

[14] As was explained, paternity by estoppel "is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told" otherwise. ***Brinkley***, 701 A.2d at 180. This doctrine has been narrowed to apply "only where it can be shown, on a developed record, that it is the best interests of the involved child." ***K.E.M. v. P.C.S.***, 38 A.3d 798, 810 (Pa. 2012).

for a house with T.M.  B.S. also filed for divorce from R.S.  T.M., but not R.S. was present for the birth of the child.  T.M. was named as the child's father on the acknowledgment-of-paternity form, and B.S. held the child out as T.M.'s child.  T.M. and his family participated in the child's baptism.  However, approximately one month after the child's birth, B.S. ended her romantic relationship with T.M.  Approximately one year after separation, and after B.S. and R.S. reconciled, B.S. withdrew her complaint for divorce.  B.S. suggested reconciliation to improve her legal position as to the case with T.M.  R.S. was "willing to live with his wife under their former family arrangement despite knowledge of all that has transpired."  ***B.S.***, 782 A.2d at 1032-34 (citation omitted).

In finding the presumption of paternity not applicable, the ***B.S.*** Court reasoned as follows:

> First, the trial court found that there is no dispute from which R.S. and B.S. need to be protected.  According to the trial court, the evidence failed to establish that there is or ever was a dispute about the identity of J.'s biological father.  The court looked to the actions of the parties from mid-September 1998 to September 1999 to support its conclusion.  Those actions included: B.S. left the marital home after learning she was pregnant; B.S. and T.M. looked for a house together; B.S. filed for divorce from R.S.; T.M. was present at J.'s birth and was named as J.'s father on the acknowledgement of paternity form provided by the hospital; T.M. added J. to his health insurance coverage immediately after her birth; and T.M. participated as J.'s father in the baptism ceremony.  Additionally, the court rejected the testimony of R.S. and B.S. that there was doubt in their minds about the identity of the biological father. . . .
>
> Second, the trial court determined that if this case is permitted to proceed on T.M.'s petition for partial custody, that there would be

- 13 -

no harm to R.S. and B.S.'s relationship, as this hellish marital situation has already occurred. The parties in this marriage have already acknowledged the affair and subsequent birth of J., the public separation, and B.S.'s holding T.M. out as the father of J. This marriage will succeed or perhaps fail with or without the application of the presumption. The trial court said it best: "Admittedly, there may be unpleasantness for [R.S.] and [B.S.] arising from [T.M.'s] exercising rights of partial custody (if he is the biological father), but the law is not intended to protect them against all such unpleasantness."

Third, the trial court found the application of the presumption could have a deleterious effect on B.S. and R.S.'s family, especially on J, in the future. The court opined, "The world knows of the appearance of things between September 1998 and September 1999. If R.S.'s biological fatherhood is a fiction, it will not be maintained. If J. eventually finds out that the truth is different from what she has been led to believe for a period of years, she may suffer greater trauma than if she knows it from the outset.

Cases such as this fall on their unique set of facts. B.S. and R.S. voluntarily gave up the benefit of the presumption for approximately one year after which they claimed the benefits of its existence for the first time. The damage to their marriage is "water under the bridge." R.S. and B.S. reconciled with full knowledge of all the facts. T.M. assumed the responsibilities he believed were his as J.'s father until he was no longer permitted to do so. At that point, he took immediate steps to assert his rights in court.

*Id.* at 1036-37 (citations omitted).

In *E.W.*, the Court affirmed the trial court's determination that the presumption of paternity applied. *E.W.*, 916 A.2d at 1205-06. In *E.W.*, T.S. had an affair with E.W. while married to C.S. *Id.* at 1199. Notably, T.S. maintained her joint relationship, marital and financial, with C.S. While T.S. represented to E.W. and his family that E.W. was the child's father, T.S. did not separate from or divorce C.S. and represented to C.S. that C.S. was the

child's father. In fact, C.S. did not even know of the relationship between E.W. and T.S. until more than one year after the child's birth. Further, C.S. was present at the child's birth and named on the birth certificate. He participated in the child's baptism and has supported the child. ***Id.*** at 1999-1200.

> The ***E.W.*** Court stated:
>
> Contrasting the facts found by the trial court in ***B.S.*** with those found by the trial court in the instant case reveals a distinction that can not [sic] be reconciled. Here, T.S. did not move out of the marital home seeking to establish living quarters with E.W., nor was a divorce complaint filed. Moreover, C.S. fulfilled all the duties of a father in connection with the birth and religious rites. And most telling as the court found based upon the evidence, C.S. and T.S. did not separate. Accordingly, we are compelled to conclude that the situation here is sufficiently distinct from that in ***B.S.*** and we, therefore, conclude that the trial court's application of the presumption of paternity was proper.

***Id.*** at 1204.

Instantly, in finding the presumption of paternity inapplicable, the trial court determined that the evidence failed to support that Appellants remained in an intact marriage, highlighting Mother's false representations and deceptive actions. The court explained:

> Testimony and evidence provided to this court over three (3) days of hearings provided this court with very specific testimony and evidence to support a finding that Mother and Husband's marriage was not intact, until, perhaps, at the time of the hearings. Mother repeatedly admitted on the record to purportedly lying to Father and many others for almost one year, about her separation from Husband and her desire to make a future with Father and their [c]hild. Evidence presented at the hearings made it quite clear that Mother regularly discussed her failed relationship with Husband and her desire to live "full time" with Father and in one

- 15 -

exhibit presented at the hearing, it is noted that on November 29, 2017, Mother told Father that she was "finally separating" from Husband and seeking her independence in her own place. Testimony at hearing adduced that Mother made her intentions know to Father's friends and colleagues.

The record revealed that Mother referred to the marital home as Husband's place and the apartment as her own place on multiple occasions and that she had Father help her to move items from the once marital home to her apartment. In fact, testimony indicates that Husband was at his home when Father, Mother and Father's friend went there to move Mother's things out, and that he and Father shook hands. The parties removed, among other items, a bed for Mother, a bed for the five[-]year[-]old, Mother's and the five[-]year[-]old's clothing and Mother's special chair for nursing. Additionally, Mother and Father decorated her apartment and Father built Ikea furniture he had purchased for Mother's apartment. Additionally, Father and Mother continued their romantic relationship in Mother's apartment after the birth of the [c]hild [in January 2018], and Father regularly visited with Mother, the [c]hild and Mother's five[-]year[-]old daughter at Mother's apartment up until the end of February 2018. Even after their sexual relationship ended and Mother ceased permitting Father to see their [c]hild, Mother admitted on the record to sending Father messages with sexual content after this action commenced. She further admitted to Father that she was not reconciling with Husband to secure their marriage, but only to insure the [c]hild and her five[-]year[-]old half-sister could stay together. She added that she would be feigning happiness with Husband to keep up appearances, while continuing to think about Father.

\* \* \*

It is clear from the record that the marriage of Mother and Husband is a facade so as to keep Father out of the [c]hild's life. While Mother and Husband may appear in public together and want the court to believe they are living happily ever after, the facts on the records and the severe lack of credibility of Mother's extensive testimony, lead this court to believe there is no intact marriage, but rather a convenient arrangement for some suspicious reason.

*Id.* at 7-9.

- 16 -

Looking to the impact on Appellants' marriage, the trial court further stated, in part,

> [t]he Supreme Court of Pennsylvania has held that " . . . the presumption [of paternity only applies where the underlying policy to preserve marriages] would be advanced by application [of the presumption] . . . " [**Fish v. Behers**], 741 A.2d 721, 723 ([Pa.] 1999). In the instant case, both Mother's and Husband's testimony that, despite acknowledging Father is the parent of the [c]hild and knowing of the lengthy affair and lies, their marriage has not suffered, and there is no need to preserve their marriage by application of the presumption of paternity. The marriage of Mother and Husband will succeed or fail with or without the application of the presumption and while there may be some unpleasantness for Mother and Husband if Father should remain in the [c]hild's life, the presumption of paternity was not intended to protect such an issue.

*Id.* at 10-11.

The record supports the trial court's findings. While Appellants did not file for divorce, Mother represented to Father and his friends and family that she and Husband were separated. N.T. Trial, 5/4/18, at 14, 95. In fact, Appellants considered separation and even leased a separate apartment in September 2017, at the suggestion of their marriage counselor. N.T. Trial, 5/7/18, at 139-40, 242-43, 250, 252; N.T. Trial, 5/4/18, at 27; **see also** Father's Ex. 17. Moreover, Mother stated to Father on numerous occasions that she was considering divorce. N.T. Trial, 5/4/18, at 17, 22, 24-25; **see also** Father's Ex. 1.

Mother also obtained a second apartment separate from the marital residence in December 2017, with Mother representing to Father that she was securing her own residence. N.T. Trial, 5/7/18, at 175-76, 178; N.T. Trial,

- 17 -

5/4/18, at 48-51; *see also* Father's Exs. 14, 15, 16, and 17. Further, Mother expressed a desire for a future with Father, and made representations to Father that this apartment could potentially be used to begin a life together. N.T. Trial, 5/4/18, at 22, 48; *see also* Father's Exs. 1, 5, and 20. As recounted by Father, Mother indicated to Father that the only reason she decided to reconcile with Husband is because she "had consulted attorneys that basically told her she would lose custody of [J.L.], and she had a better -- she believes she had a better shot basically trying to manipulate the presumption loss [sic] to deny me my paternity rights." N.T. Trial, 5/17/18, at 304. In addition, [Child] was held out as Father's child to Father's friends, colleagues, and family, to various doctors and/or medical staff, and on social media. N.T. Trial, 5/17/18, at 305-07; N.T. Trial, 5/7/18, at 181-82, 184-85, 194, 205-06; N.T. Trial, 5/4/18, at 28, 55-59; *see also* Father's Ex. 11.

Therefore, we find the record supports the trial court's conclusion that the presumption of paternity does not apply. *See B.S.*, 782 A.2d at 1037. The record substantiates the determination that Appellants' marriage was not intact. Further, based on Husband's own testimony, the marriage in question does not require protection, thereby triggering the presumption. *See id.* As in *B.S.*, any damage to Appellants' marriage is "water under the bridge." *See id.*

While Appellants understandably reference the unpleasantness and burden presented by the situation, and Mother may wish to shield and protect

Husband and her family, as we stated in **B.S.**, the presumption of paternity was not designed to protect against all unpleasantness. **See id.** The fact that Child has been held out to a certain extent as Father's child also weighs against applying the presumption. Therefore, as in **B.S.**, there is the potential for a negative impact on the family, particularly Child, if Child were to discover her true paternity. **See id.**

> Lastly, as to credibility, the trial court stated,
>
> [t]he record from three (3) days of hearings is replete with Mother admitting to numerous lies to Father and Husband over the course of her relationship with Father, causing this [c]ourt to place little credibility on any of Mother's testimony, especially concerning the status of her marriage to Husband. Additionally, contradicting testimony by other witnesses led this [c]ourt to believe that the marriage of [Appellants] was not intact and[,] therefore, the [g]enetic [t]esting was ordered.

Trial Ct. Op., 7/31/18, at 5-6.

We agree. We have held that it is within the purview of the trial court to make findings based upon credibility. **See E.W.**, 916 A.2d at 1202. We have reviewed the extensive record, and although we acknowledge the existence of conflicting testimony, this Court simply cannot disturb the trial court's credibility determinations. **See id.** Accordingly, the trial court did not err in declining to apply the presumption of paternity. **See Barr**, 927 A.2d at 639.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/26/2019