J-A25005-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| B.C. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| C.P. AND D.B. | : | |
| | : | |
| Appellants | : | No. 515 WDA 2022 |

Appeal from the Order Entered April 18, 2022,
in the Court of Common Pleas of Westmoreland County,
Domestic Relations at No(s):  No. 1494 of 2021-D.

BEFORE:  KUNSELMAN, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: JANUARY 6, 2023**

Appellant C.P. (Mother), and her husband Appellant D.B. (Husband), appeal from the order issued by the Westmoreland County Court of Common Pleas, which granted the request of Appellee B.C. (Mother's Former Boyfriend) to have the Mother's Child genetically tested to establish paternity.  Mother and Husband argue that the presumption of paternity precludes an order for genetic testing.  Alternatively, they argue that the doctrine of paternity by estoppel precludes such an order.  After careful review, we affirm.

The record discloses the following factual and procedural history: Mother and Husband married in September 2016.  In 2017, Mother sought addiction treatment at the Greenbriar Treatment Center.  There, she met Former Boyfriend, who was also seeking help.  Mother and Former Boyfriend began communicating in Spring 2018 through social media.  In July 2018,

Mother and Husband separated; Mother remained in the marital residence, while Husband moved out.

Former Boyfriend went to Mother's residence three times in October 2018. During at least one of these occasions, Former Boyfriend and Mother had unprotected sex. Soon thereafter, Mother and Husband had rekindled their relationship; Mother does not remember the exact date, but they also had unprotected sex in late October 2018. On November 4, 2018, Mother and Husband reconciled, and Husband moved back into the marital residence.

Mother did not experience pregnancy symptoms until March 2019. She could not pinpoint when the Child was conceived. While a typical nine-month pregnancy meant that the Child was conceived in September 2018, Mother stated she was not intimate with anyone during that time. While the Child had a low birth weight, there was no other indication that the Child was born prematurely.

When Mother discovered she was pregnant, she told Husband that the Child was his. In Spring 2019, Former Boyfriend discovered through social media that Mother was pregnant. At that time, Mother told Former Boyfriend that the Child was not his. During Mother's pregnancy, Husband went to all prenatal appointments and assumed the duties of an expectant father. When the Child was born in June 2019, Husband was listed as the father on the Child's birth certificate.

After the birth, Mother began going to Former Boyfriend's home with the Child. In August 2019, Mother told Former Boyfriend that he was the

biological father. Former Boyfriend began seeing the Child on a weekly basis. He would also babysit while Mother worked long shifts as a nurse. Mother and Husband separated again, and Mother and the Child moved in with Former Boyfriend in March or April 2020.

While living together, Mother told Former Boyfriend's friends and family that he was the father. Former Boyfriend assumed the parental and financial duties. Mother traveled from Former Boyfriend's residence on the weekends to allow Husband to see the Child. Former Boyfriend did not object to Mother doing this, because Former Boyfriend felt sympathy toward Husband. Former Boyfriend thought that Mother had told Husband that Husband was not the father. Former Boyfriend thought Husband was distraught.

The relationship between Mother and Former Boyfriend ended in August 2020, after Former Boyfriend assaulted Mother.[1] The last time Former Boyfriend saw the Child was in November 2020, when Mother brought the Child to visit him in a rehabilitation center.

Between August 2020 and January 2021, Mother and Husband had reconciled, separated, and then reconciled again. Husband filed for divorce, and a custody order was entered awarding shared custody to Mother and Husband. Former Boyfriend said he did not seek custody during this time, because he was still receiving in-patient care at the rehabilitation center.

---

[1] Boyfriend pleaded no contest to the assault in December 2021.

Husband and Mother ultimately chose not to proceed with the divorce, and they remain together.

On August 27, 2021, Former Boyfriend filed a complaint to establish paternity for genetic testing of the Child. On October 14, 2021, Mother and Husband filed an answer and new matter, seeking to dismiss the complaint with prejudice, based on the presumption of paternity. The trial court conducted a hearing on April 11, 2022, during which Former Boyfriend appeared *pro se*.

The trial court ruled that the presumption of paternity does not apply, notwithstanding the fact that Mother and Husband are still married. The court ruled further that they were not entitled to relief under the doctrine of paternity by estoppel. Thus, the court denied the Mother and Husband's motion to dismiss and ordered the parties and the Child to appear at the domestic relations office for paternity testing.

Mother and Husband timely appealed. They present the following issues for our review:

> 1. Whether the trial court erred in failing or refusing to apply the presumption of paternity and/or finding that it is rebuttable, where the law and facts clearly demonstrate that the presumption applies in the case?
>
> 2. Whether the trial court misinterpreted or misapplied the law in failing to apply the paternity by estoppel doctrine to prevent [Former Boyfriend] from asserting his paternity claim?

Mother and Husband's Brief at 6.

We review orders directing or denying genetic testing for an abuse of discretion. *See Barr v. Bartolo*, 927 A.2d 635, 639 (Pa. Super. 2007). "For our purposes, an abuse of discretion requires proof of more than a mere error of judgment, but rather evidence that the law was misapplied or overridden, or that the judgment was manifestly unreasonable or based on bias, ill will, prejudice or partiality." *Id.* (citations omitted); *see also K.E.M. v. P.C.S.*, 38 A.3d 798, 803 (Pa. 2012). Additionally, "it is well-settled that the trial court, sitting as factfinder, weighs the evidence and assesses credibility. Thus, the court 'is free to believe all, part, or none of the evidence, and we, as an appellate court, will not disturb the credibility determinations of the court below.'" *DeRosa v. Gordon*, -- A.3d --, 2022 WL 17099037 at *4 (Pa. Super. November 22, 2022) (citing *Vargo v. Schwartz*, 940 A.2d 459, 462 (Pa. Super. 2007) (brackets omitted)).

The legal determination of paternity of a child conceived or born during marriage derives from common law. The presumption of paternity and the doctrine of estoppel embody "the two great fictions of the law of paternity: the presumption of paternity embodies the fiction that regardless of biology, the married people to whom the child was born are the parents; and the doctrine of estoppel embodies the fiction that, regardless of biology, in the absence of a marriage, the person who has cared for the child is the parent."

*Brinkley v. King*, 701 A.2d 176, 180 (Pa. 1997) (Opinion Announcing the Judgment of the Court).[2]

In *Brinkley*, a divided Supreme Court grappled with the modernization of this jurisprudence. The Plurality identified a legal framework to resolve these issues:

> [T]he essential legal analysis in these cases is twofold: first, one considers whether the presumption of paternity applies to a particular case. If it does, one then considers whether the presumption has been rebutted. Second, if the presumption has been rebutted or is inapplicable, one then questions whether estoppel applies. Estoppel may bar either a plaintiff from making the claim or a defendant from denying paternity.

*Brinkley*, 701 A.2d at 180.

Beginning the first inquiry, we must determine whether the presumption applies here. The trial court ruled that it does not. In their first appellate issue, Mother and Husband challenge this determination.

Initially, we observe the purpose of the presumption. "The policy underlying the presumption of paternity is the preservation of marriages. The

_____

As Justice Newman explained in a concurring and dissenting opinion:

> It has long been the law in Pennsylvania that a child born to a married woman is presumed to be a child of the marriage. This presumption arose (a) to protect marital integrity and (b) to prevent a child from being labeled a "bastard" child, a classification that carried both a social and a legal stigma. Modern laws, however, have erased the legal stigma of children born out of wedlock, hence depriving the presumption of one of its original purposes.

*Brinkley*, 791 A.2d at 258 (Newman, J., Concurring)

presumption only applies in cases where that policy would be advanced by the application; otherwise, it does not apply." ***Fish v. Behers***, 741 A.2d 721, 723 (Pa. 1999) (citing ***Brinkley***, 701 A.2d at 181); ***see also J.L. v. A.L.***, 205 A.3d 347 (Pa. Super. 2019). "Although the presumption may be rebutted by clear and convincing evidence of a husband's non-access, impotency, or sterility, the presumption is irrebuttable where the mother, the child, and the husband live together as an intact family and husband assumes parental responsibility for the child." ***B.S. v. T.M.***, 782 A.2d 1031, 1034 (Pa. Super. 2001) (citations omitted); ***see also Strauser v. Stahr***, 726 A.2d 1052, 1055-56 (Pa. 1999).

As applied here, Mother and Husband argue that the presumption of paternity applies, because the Child was born during the marriage and because the family is intact. Although they recognize the changes in jurisprudence commensurate with the changes in attitudes, they argue that situations still exist, where the presumption of paternity retains its "traditional iron clad status." ***See*** Mother and Husband's Brief at 19.

For support, Mother and Husband rely on our Supreme Court's decision in ***Strauser***, ***supra.*** There, the trial court ordered a paternity test; this Court reversed, and our Supreme Court affirmed our decision. The High Court concluded the presumption applied, because the mother and her husband were still married:

> Indeed, despite all the marital difficulties that they have encountered, [m]other and [h]usband have never separated. Instead, they have chosen to preserve their

marriage and to raise as a family the three children born to them, including [the subject child, whose paternity was at issue].

*Strauser*, at 726 A.2d at 1055; *see also John M. v. Paula T.,* 571 A.2d 1380, 1386 (Pa. 1951).

At first glance, we note several similarities between *Strauser* and the instant case. In both matters, the mother had sexual relations with both prospective fathers around the time of conception. In both matters, the mother had, at one point, held the non-spouse out as the child's biological father and encouraged their relationship. Additionally, in both matters, the husband displayed varying levels of acquiescence regarding the relationship between the mother and the non-spouse, as well as the relationship between child and the non-spouse. *See generally* Trial Court Opinion (T.C.O.), 5/23/22, at *1-5 (not paginated), *cf. Strauser*, 726 A.2d. at 1053.

But there is one critical distinction between *Strauser* and the present appeal. In *Strauser*, the High Court observed that the mother and the husband "never separated." *Strauser*, 726 A.2d*.* at 1053, 1055. Their marriage (and thus their family unit) had always remained intact. As a result, the High Court determined that their marriage warranted the protection of the presumption of paternity – and perhaps especially so, in light of the fact that the mother and the husband had two other children together. The Court concluded that the Commonwealth's interest in protecting the "basic and foundational unit of the family" meant that the presumption applied. *Id.* (quoting *John M.*, 571 A.2d at 1386).

Here, by contrast, Mother and Husband separated on three occasions, including when the Child was conceived.[3] This was a critical factor for the trial court. *See* T.C.O. at *6-8 (citing *B.S. v. T.M.*, 782 A.2d 1031 (Pa. Super. 2001) and *J.L. v. A.L.*, 205 A.3d 347 (Pa. Super. 2019)).

In order for us to decide whether the presumption of paternity applies, we must first determine the legal significance of Mother and Husband's history of separation. Had Mother and Husband proceeded with their divorce, the answer would be obvious; the presumption would not apply since there would no longer be "an intact family or a marriage to preserve." *Fish*, 741 A.2d at 723 (concluding that the presumption did not apply when the parties had divorced). Similarly, had the parties remained separated, even if they had not finalized their divorce, we would still be inclined to conclude that the presumption did not apply. *See, e.g., T.L.F. v. D.W.T.*, 796 A.2d 358 (Pa. Super. 2002); *Vargo v. Schwartz*, 940 A.2d 459 (Pa. Super. 2007).

However, Mother and Husband separated several times, but ultimately reconciled and remained together at the time of the litigation. To determine whether this separation impacts the presumption, we are guided by the following precedents.

First, in *B.S. v. T.M.*, 782 A.2d 1031 (Pa. Super. 2001), the trial court determined that the presumption of paternity did not apply, notwithstanding

---

[3] We note that the Divorce Code generally does not categorize a post-separation sexual relationship as "marital misconduct." *See, e.g., S.M.C. v. W.P.C.*, 44 A.3d 1181, 1186 (Pa. Super. 2012) (citing *Jayne v. Jayne*, 663 A.2d 169, 173 (Pa. Super. 1995)).

the fact that the mother and the husband were in an intact family. The trial court in *B.S.* reached this decision for a few reasons: 1) there was no real dispute that the third-party was the biological father; 2) that the third-party's custody petition would not harm the marriage ("this hellish marital situation has already occurred" and "[t]his marriage will succeed or perhaps fail with or without the application of the presumption"); and 3) application of the presumption could have a "deleterious effect" on the family if the child finds out years later that the truth was different from what she was led to believe. *See generally B.S.*, 782 A.2d at 1036-37.

On appeal, this Court observed that paternity cases "fall on their unique set of facts." *B.S.*, 782 A.2d. at 1037. Ultimately, we held that because the marital couple separated for a whole year, the presumption did not apply. "[The marital couple] voluntarily gave up the benefit of the presumption for approximately one year after which they claimed the benefits of its existence for the first time." *Id.* In reaching this conclusion, we explicitly distinguished *Strauser*. We noted the marital couple in *Strauser* "remained intact at all times." *Id.* at 1036. By contrast, in *B.S.*, the mother and the husband separated, during which time she began a romantic relationship with a third-party. The mother also filed a divorce complaint, which she eventually withdrew. *Id.* at 1033.

A few years later, in *E.W. v. T.S.*, 916 A.2d 1197, 1201 (Pa. Super. 2007), we concluded that the presumption applied, because like in *Strauser*,

the marital couple never separated. *E.W.*, 916 A.2d at 1201 (citing *Strauser*, 726 A.2d. at 1055). We explained:

> Contrasting the facts found by the trial court in *B.S.* with those found by the trial court in the instant case [(*E.W.*)] reveals a distinction that cannot be reconciled. Here, [the mother] did not move out of the marital home seeking to establish living quarters with [the third-party], nor was a divorce complaint filed. Moreover [the husband] fulfilled all the duties of a father in connection with the birth and religious rites. ***And most telling as the court found based upon the evidence, [the marital couple] did not separate***. Accordingly, we are compelled to conclude that the situation here is sufficiently distinct from that in *B.S.* and we, therefore, conclude that the trial court's application of the presumption of paternity was proper.

*E.W.*, 916 A.2d at 1204 (emphasis added).

In *B.S.* and *E.W.*, we reached opposite conclusions with respect to the applicability of the presumption. But in both cases, we investigated whether the respective marital couple stayed together or separated, to answer the larger question of whether the presumption would advance the policy of preserving marriages and intact families.

More recently, we concluded a mother who separated from her spouse could not use the presumption as shield to defeat a third-party's custody complaint. *See J.L. v. A.L.*, 205 A.3d 347 (Pa. Super. 2019). In *J.L.*, the married couple separated, and the mother obtained a separate residence. *J.L.*, 205 A.3d at 357. Although a divorce complaint was never filed, the mother had considered divorce on numerous occasions. *Id.* The trial court ultimately concluded that mother only sought to use the presumption as a

shield to defeat the third-party's custody complaint. *See generally id*. at 356-57. On appeal, we noted that presumptions do not automatically apply to cases involving a married couple. We concluded, as in *B.S.*, that the couple had voluntarily given up the benefit of the presumption during their separation.

Although our Supreme Court has not specifically addressed this Court's emphasis on marital separation as a basis for finding the presumption inapplicable, in 2012, the High Court acknowledged that the "legal fictions perpetuated through the years…[still] retain their greatest force where there is truly an intact family attempting to defend itself against third-party intervention." *K.E.M. v. P.C.S.*, 38 A.3d 798, 809 (Pa. 2012).[4]

We note that the application of these legal fictions has never been as mechanical as Mother and Husband claim. Even in *Brinkley*, the polestar of our modern jurisprudence on the presumption of paternity, recognized:

> It remains to consider how one knows whether the presumption applies in any given case. Traditionally, the answer to this question has been that the presumption applies if the child was conceived or born during the marriage. We now question the wisdom of this application of the presumption because the nature of male-female relationships appears to have changed dramatically since the presumption was created. […] Today, however, separation, divorce, and children born during marriage to

---

[4] In *K.E.M.*, the Supreme Court explicitly noted that its case concerned paternity by estoppel, not the presumption of paternity. Nonetheless, in a general sense, the Court alluded to the "trend in the decisional law to narrow the concept of an 'intact marriage' and, correspondingly, the application of the presumption." *See K.E.M.*, 38 A.3d at 805 (addressing the arguments of the appellee).

third party fathers is relatively common, and *it is considerably less apparent that application of the presumption to all cases in which the child was conceived or born during the marriage is fair*."

***Brinkley***, 701 A.2d at 181 (Plurality) (emphasis added).

Returning to the instant matter, the trial court found that the presumption did not apply, because their marriage was not in need of protection. The court reasoned that, like in ***B.S.***, the couple's marital difficulty was "water under the bridge" and that their marriage "will succeed or perhaps fail with or without the application of the presumption." ***See*** T.C.O. at *7, *8 (quoting ***B.S.***, 782 A.2d at 1037). In fact, here, Mother and Husband acknowledged that the circumstances of this case only made their marriage stronger. Husband also acknowledged that Mother and Former Boyfriend were together for at least four months in 2020 – after the Child's birth – and that Mother was intimate with Former Boyfriend shortly before being intimate with him in October 2018. "With all of this information in mind, Husband indicated that he still wants to be married to Mother." ***Id.*** at *7-8. The court noted that the Mother and Husband do not plan on separating again, regardless of the outcome of the litigation and genetic testing. As such, the paternity test would merely confirm or disprove what the parties have likely considered to be a very real possibility. ***Id.*** at *8.

On appeal, Mother and Husband cite to various aspects of our aforementioned precedents to distinguish or analogize their case. But the common factor in all of these cases was whether the marital couple had

separated. The presumption only applied when the marital couple never separated, then the family has remained intact. "The public policy in support of the presumption…was 'the concern that marriages which function as family units should not be destroyed by disputes over the parentage of children conceived or born during the marriage.' Thus, 'third parties should not be allowed to attack the integrity of a functioning marital unit[.]'" **Strauser**, 726 A.2d at 1054 (quoting **Brinkley**, 701 A.2d at 180). But where the marital couple separated and the family did not remain intact, the marriage did not warrant the protections afforded by the presumption. **See B.S.; J.L.**, **supra.**

Here, the Child was conceived while the marital couple was separated. After the Child's birth, the couple separated two more times. Importantly, during one of these separations, Mother lived with Former Boyfriend and held him out as the father.[5] It's not merely that Mother and Husband separated; it's that during this separation, Mother lived with Former Boyfriend and raised the Child together. At that point, Mother and Husband "gave up the benefit of the presumption." **See B.S.**, 782 A.2d at 1037. Therefore, on these facts, we conclude that the trial court was within its discretion when it found that presumption of paternity does not apply. Mother and Husband's first appellate issue is without merit.

---

[5] Mother testified she did not remember if she told Former Boyfriend, or his family, that he was the father. Mother testified that she has memory issues due to her epilepsy diagnoses and medications for the same. The trial court explicitly found Mother's testimony lacked credibility. **See** T.C.O. at 4, ¶¶ 28-29. We cannot disturb a trial court's credibility finding. **See DeRosa,** -- A.3d --, 2022 WL 17099037 at *4.

We turn now to Mother and Husband's second appellate issue that Former Boyfriend is estopped from seeking a paternity test. The trial court determined that the doctrine of paternity by estoppel also does not apply in this case.

This Court has explained that estoppel:

> is merely the legal determination that because of a person's conduct (e.g., holding the child out as his own or supporting the child), that person, regardless of his true biological status, will not be permitted to deny parentage. ... [T]he law will not permit a person in these situations to challenge the status that he or she has previously accepted. The doctrine of paternity by estoppel seeks to protect the interests of the child.
>
> Estoppel is based on the public policy that children should be secure in knowing who their parents are. If a certain person has acted as the parent and bonded with the child, the child should not be required to suffer the potentially damaging trauma that may come from being told that the father [s]he had known all [her] life is not in fact [her] father.
>
> [O]ur Supreme Court recently considered the continuing applicability of the doctrine and held that it is the interests of the child that are paramount: "paternity by estoppel continues to pertain in Pennsylvania, but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child." **K.E.M. v. P.C.S.**, 38 A.3d 798, 810 (Pa. 2012).

**T.E.B. v. C.A.B.**, 74 A.3d 170, 173-74 (Pa. Super. 2013) (some quotation marks and citations omitted).

"Where [paternity by] estoppel is applied, blood tests may be irrelevant, for the law will not permit a person in estoppel situations to challenge the status which he or she has previously accepted. Only when estoppel does not

apply will blood tests be ordered." ***D.M. v. V.B.***, 87 A.3d 323, 327 (Pa. Super. 2014) (citing ***Freedman v. McCandless***, 654 A.2d 529, 532 (Pa. 1995)).

While the estoppel doctrine most often appears in the context of a child support matter, its application is not limited to those situations. The doctrine "also can serve to preclude a [(purported)] biological father from asserting his parental rights." ***T.E.B.***, 74 A.3d at 174; ***see also DeRosa***, ***supra***; ***and see C.T.D. v. N.E.E.***, 653 A.2d 28 (Pa. Super. 1995).

In ***C.T.D.***, a third-party sought to bring a paternity claim against the mother and her husband. When the child was conceived, she was seeing the third-party and the husband (although the mother and the husband were not yet married at the time). After the birth, the mother and the husband married and raised the child together. Eventually, the husband was named as the father on the child's birth certificate. The marital couple held the husband out as the father. A third-party then filed a paternity claim. We concluded that the actions of the marital couple did not estop the third-party from bringing the claim. "While it is clear that paternity by estoppel could be applied to preclude either [the husband] or [the mother] from challenging [the husband's] paternity, we find no support for the argument that their actions can estop [the third-party] from asserting his alleged paternity." Instead, we concluded that the third-party's own failure to act during the child's' first two years of life may have effectively estopped him from raising his claim of paternity. ***C.T.D.***, 653 A.2d at 31. We remanded for the trial court to make that determination.

Similarly, in ***B.K.B. v. J.G.K.***, 954 A.2d 630, 638 (Pa. Super. 2008), this Court found that the purported father was estopped from bringing a paternity claim, where he had known about his alleged paternity since the child was conceived, but allowed the relationship between the child and another man to flourish for nine years.

Instantly, the trial court found that, like in ***C.T.D.***, Mother and Husband's actions had little bearing on whether the Former Boyfriend could bring a paternity claim. ***See*** T.C.O. at \*10. Rather, the court believed the more appropriate question was whether Former Boyfriend's own actions estopped him from asserting his parental claim at this stage in the Child's life. The court found that the Former Boyfriend's actions did not prevent him from asserting the claim.

We find not abuse of discretion. When Mother told the Former Boyfriend that he was the father, the Former Boyfriend began holding himself out as such. After the romantic relationship ended between Mother and Former Boyfriend, he petitioned for genetic testing. We note that approximately ten months elapsed between the last time Former Boyfriend saw the Child and his petition. However, the trial court was satisfied by Former Boyfriend's testimony that he would have petitioned sooner, but he was undergoing in-patient rehabilitation. ***Id.*** at 11.

We are not persuaded by Mother's argument that she also held Husband out as the Child's father. If anything, she told both men that they were the biological father, perhaps during the same time period. Likewise, we are also

not persuaded by Husband's argument that he always thought that he was the biological father. This argument might be relevant in a different set of circumstances – *i.e.*, to estop Mother from denying Husband's paternity claim. But Husband's argument is not particularly relevant in this context, where an alleged third-party is seeking to establish paternity.

As our Supreme Court held, paternity by estoppel continues to exist in Pennsylvania, "but it will apply only where it can be shown, on a developed record, that it is in the best interests of the involved child." ***K.E.M.***, 38 A.3d at 810. Here, the trial court ultimately concluded that "the underlying policy concerns regarding the doctrine of estoppel are not present in this case." ***See*** T.C.O. at 12. For this reason, we conclude that it was within the trial court's discretion to conclude that the doctrine of estoppel does not apply in this case. Mother and Husband's second issue is without merit.

In sum, we conclude that the trial court did not abuse its discretion when it granted Former Boyfriend's request for genetic testing. The presumption of paternity does not apply, because the marital couple was separated at the time of conception, and again after the birth of the Child, at which time Mother lived with Former Boyfriend and raised the Child with him. Also, the trial court was within its discretion to conclude that Former Boyfriend's actions did not estop him from bringing a paternity claim. Former Boyfriend waited less than a year and was partially delayed by his in-patient treatment.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date:  1/6/2023