**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY JJ.**

| | | |
|---|---|---|
| B.C., | : | No. 8 WAP 2023 |
| | : | |
| Appellee | : | Appeal from the Order of the |
| | : | Superior Court entered January 6, |
| | : | 2023, at No. 515 WDA 2022, |
| v. | : | affirming the Order of the Court of |
| | : | Common Pleas Westmoreland |
| | : | County entered April 18, 2022, at |
| C.P. AND D.B., | : | No. 1494 of 2021-D. |
| | : | |
| Appellants | : | SUBMITTED: August 25, 2023 |

**OPINION**

**CHIEF JUSTICE TODD**                    **DECIDED: JANUARY 29, 2024**

There is a strong presumption in Pennsylvania jurisprudence that a child conceived or born in a marriage is a child of the marriage, and a party challenging the paternity of a child born during a marriage must overcome that presumption. Due to societal changes which have occurred since the presumption's adoption, this Court has limited its application to cases where its underlying policy — the preservation of marriages — is furthered. This Court granted allowance of appeal to determine whether the lower courts erred by relying primarily upon the marital couple's multiple periods of separation prior to the filing of the underlying paternity action in concluding that the presumption was inapplicable, notwithstanding that the couple had reconciled by the time the paternity action was filed. For the reasons set forth herein, we answer this inquiry in the affirmative, and hold that a marital couple's separation prior to the filing of the paternity action does

not, *per se*, preclude application of the presumption of paternity. Accordingly, we reverse the order of the Superior Court, and remand to the trial court with instructions.

At the outset, we observe that Appellee B.C., who filed the paternity action herein, has not participated in this appeal,[1] and has never challenged the continued viability of the presumption of paternity, which, although entrenched in our jurisprudence for centuries, has been the subject of considerable criticism in the modern age. Thus, we emphasize that we are deciding this appeal as it is presented to us, and are determining only whether the lower court's application of the unchallenged presumption violates the precedent of this Court. We conclude that it does. We do not address whether the presumption of paternity, which again, as a general doctrine is unchallenged here, should be reconsidered.

## I. Background

The record establishes that Appellants C.P. ("Mother") and D.B. ("Husband") were married on September 30, 2016. Mother met Appellee B.C. the following year when they were both seeking treatment for addiction at the Greenbriar Treatment Center. Mother and B.C. reconnected and began communicating through social media in Spring 2018. In July of that year, Mother and Husband separated; Husband left the marital home and Mother remained. B.C. visited Mother's residence three times in October 2018, and during at least one of those occasions they had unprotected sexual intercourse. Shortly thereafter, at the end of October, Mother and Husband reconciled, and they also had unprotected sex. On November 4, 2018, Husband moved back into the marital home, and the couple continued their intimate relationship.

---

[1] B.C. also did not participate in the appeal before the Superior Court.

Mother did not experience signs of pregnancy until March 2019, and was unable to pinpoint when her child was conceived.[2] Upon discovering that she was pregnant, she told Husband that the child was his. After B.C. learned on social media that Mother was pregnant, the two corresponded, and Mother initially advised B.C. that he was not the father of her child. During Mother's pregnancy, Husband accompanied Mother to prenatal appointments and assumed the duties of an expectant father. While married to Husband, Mother then gave birth to a son ("Child") on June 18, 2019, and Husband was listed as the father on Child's birth certificate. However, after the birth, Mother brought Child to visit B.C., and in August 2019, told B.C. that he was Child's biological father.[3] Subsequently, B.C. began seeing Child on a weekly basis, babysitting him while Mother worked long shifts as a registered nurse.

In March or April 2020, when Child was approximately nine months old, Mother and Husband separated for the second time. Mother then moved into B.C.'s home with Child, and Mother and B.C. shared parental and financial duties relating to Child. During this time, Mother told B.C.'s friends and family that B.C. was Child's father. Nevertheless, Mother took Child to see Husband on the weekends. B.C. did not object to Mother allowing Husband to see Child, as he felt sympathy towards Husband. The relationship between Mother and B.C. ended abruptly on August 13, 2020, when B.C. assaulted Mother,[4] after which Mother and Child returned to live in the marital home, and Mother and Husband reconciled. The last time that B.C. had contact with Child was in November

---

[2] Initially, Mother had not considered that she was pregnant, as she suffered from polycystic ovarian syndrome, and believed that conception would have been difficult.

[3] As described *infra*, the trial court conducted a paternity hearing, during which Mother testified that she did not recall telling B.C., or any other third party, that B.C. was Child's father. The trial court expressly discredited this portion of Mother's testimony.

[4] On December 8, 2021, B.C. pled guilty to a charge of simple assault arising from the incident with Mother. N.T., 4/11/2022, at 12.

2020, when Mother and Child visited B.C. in the rehabilitation center where he was residing at the time.

Husband and Mother separated for a third and final time for a period of approximately five weeks in December 2020 and January 2021, after Husband filed for divorce and his counsel suggested that Mother move out of the marital home while a custody order was crafted. Consequently, the trial court entered a custody order awarding shared legal and physical custody of Child to Mother and Husband. B.C. remained in the rehabilitation facility during the litigation of the custody matter and did not seek to intervene. Husband and Mother once again reconciled, and chose not to proceed with the divorce. Mother moved back into the marital home on January 13, 2021, and the couple have remained together since that time.

On August 27, 2021, B.C. filed a complaint to establish paternity and for genetic testing of Child. In response, Appellants jointly filed an answer and new matter, which contained a motion to dismiss B.C.'s complaint with prejudice, contending that the presumption of paternity applied to preserve their intact family unit. As explained *infra*, the presumption that a child conceived or born during a marriage is a child of the marriage may be rebutted by evidence establishing that either the husband did not have access to his wife during the period of possible conception or that the husband was impotent or sterile; where the marriage is intact, the presumption is irrebuttable. The trial court held a hearing on April 11, 2022, at which B.C., Mother, and Husband testified to the aforementioned events.

Additionally, Mother testified that she and Husband have been together since January 2021, prior to the filing of the paternity action, and that she did not contemplate any future separations because the marriage was working. N.T., 4/11/2022, at 42. Viewing the circumstances retrospectively, Mother believed that the marital issues

resulted from depression and anxiety that she was experiencing at the times of the separations. Mother further explained that Child has special needs and was diagnosed with autism spectrum disorder level 3 and global delay disorder. Describing Husband as a "wonderful parent" and "truly a great father," Mother asserted that Child is Husband's number one priority, that Husband tends to Child in the middle of the night, and that Husband takes Child to his doctor appointments and therapy sessions. *Id.* at 39. Mother elaborated that Husband is Child's "person," as demonstrated by the fact that when Child is inconsolable, he turns to Husband, who has "endless patience and kindness" for Child, "loves [Child] so much," and "is unbelievably bonded" to Child. *Id.* at 41-42. Mother concluded that she and Husband are doing very well raising their son. *Id.* at 42.

Husband corroborated Mother's testimony and detailed his extensive parental duties. *Id.* at 56. Husband further asserted that he never believed that B.C. was Child's father, and never acquiesced to having B.C. act in a parental capacity. *Id.* at 57-58. When asked about his relationship with Mother and their family unit, Husband acknowledged the tumultuous periods, but expressed love for Mother and Child, confirming that he had no concerns of a future separation with Mother, as he found that the trials and tribulations they experienced together made their marriage stronger. *Id.* at 59-60. When questioned whether the injection of a third party as an additional parental figure to Child would impact his family unit, Husband responded, "[d]efinitely," finding the proposition "utterly preposterous." *Id.* at 59.

Finally, B.C., appearing *pro se* at the hearing, testified that the time of Child's conception corresponded with the time of his sexual relationship with Mother. He maintained that, after Mother informed him that he was Child's father, he saw Child regularly and shared parental duties, until Mother ended the relationship. B.C. asserted that he did not seek to intervene in Child's custody action because he was seeking

inpatient care at a rehabilitation facility when the matter was litigated. B.C. did not attempt to refute Appellants' contention that their marriage was, at that time, intact. Lastly, B.C. argued that the court should grant his request for genetic testing because he believes he is Child's father, he wants to take responsibility for his son, and he wants to save Child from suffering trauma later in life if he discovers that his true parentage is different from what he had been led to believe.

## II. Lower Court Decisions

By order dated April 14, 2022, the trial court denied Appellants' motion to dismiss the paternity action, and directed all parties and Child to appear at the domestic relations office for paternity testing on May 3, 2022. Appellants filed an appeal to the Superior Court, and the trial court filed its Pa.R.A.P. 1925(a) opinion on May 27, 2022.[5] Initially, the trial court observed that, when examining paternity, the court considers whether the presumption of paternity applies to the particular case and, if so, whether the presumption has been rebutted; if the presumption has been rebutted or is inapplicable, the court then queries whether estoppel applies.

Recognizing that the presumption applies "only where the underlying policy of the presumption, *i.e.*, to preserve marriages, would be advanced by its application," Trial Court Opinion, 5/27/2022, at 5 (unpaginated) (quoting *Brinkley v. King*, 701 A.2d 176, 179 (Pa. 1997) (plurality)),[6] the trial court examined Superior Court case law holding that the presumption is inapplicable where the marriage in question does not require protection. *Id.* at 6-7 (discussing *B.S. v. T.M.*, 782 A.2d 1031, 1037 (Pa. Super. 2001) (presumption

---

[5] Due to this Court's concern for the best interests of the child, court orders directing blood tests to determine paternity are immediately appealable, even though they are interlocutory. *Jones v. Trojak*, 634 A.2d 201, 204 (Pa. 1993).

[6] As explained *infra*, although *Brinkley* was a plurality decision, four Justices agreed with the primary holding.

of paternity is inapplicable where the marriage does not need protection from the effects of disputed paternity because the marital couple had fully reconciled and any damage to the marriage was "water under the bridge"); *J.L. v. A.L.*, 205 A.3d 347 (Pa. Super. 2019) (presumption of paternity is inapplicable where the mother and husband did not have an intact marriage when the child was conceived or born, and the husband's testimony established that the marriage did not require the protection that the presumption affords)).

The trial court emphasized that Husband is aware that Mother had been intimate with both Husband and B.C. in October 2018, the period during which Child was purportedly conceived, and that she resided with B.C. for at least four months in 2020 after Child was born, yet Husband desires to remain in the marriage, regardless of the outcome of the genetic testing. Relying upon Appellants' statements that their marital strife has made their union stronger, and that the couple has no plans of ever separating, the trial court reasoned that, as in *B.S.* and *J.L.*, Mother's relationship with B.C. is "water under the bridge" and Mother and Husband have moved on from their past marital difficulties. *Id.* at 7 (citing *B.S.*, 782 A.2d at 1037). Reasoning that the marriage does not require the protection that the paternity presumption affords, the trial court found that genetic testing "would merely confirm or disprove what the parties have likely considered to be a very real possibility," and that the purpose underlying the presumption will not be furthered by applying the presumption because Appellants "testified that the court's determination will not affect the marriage." *Id.* at 8.

Thus, the court concluded that the presumption was inapplicable, and so reasoned that it need not determine whether the presumption was rebuttable or irrebuttable. Nevertheless, employing similar reasoning as espoused in *B.S.* and *J.L.*, the trial court alternatively found that the evidence failed to demonstrate Appellants "remained in an intact marriage" – a finding which would have rendered the presumption irrebuttable –

due to the marital couple's three prior separations, once during the period that child was purportedly conceived, and again after Child was born, when Mother moved in with B.C. for at least four months and held him out to be Child's father, while simultaneously claiming that Child belonged to Husband. *Id.* at 9-10.

Finally, the trial court held that B.C. was not estopped from asserting paternity, as the policies underlying estoppel were not implicated, considering that B.C. was asserting parentage and not denying it; B.C. never accepted that Husband was Child's father; and B.C. explained that he would have filed the paternity action sooner had he not been in a rehabilitation facility. Thus, the court denied Appellants' motion to dismiss and ordered paternity testing.

In a unanimous, unpublished memorandum opinion, the Superior Court affirmed. *B.C. v. C.P.*, 515 WDA 2022 (Pa. Super. filed Jan. 6, 2023). Like the trial court, the Superior Court began by observing that, when examining paternity, the court considers whether the presumption of paternity applies to the facts presented and, if so, whether the presumption has been rebutted; if the presumption has been rebutted or is inapplicable, the court examines whether estoppel applies.

Addressing Appellants' contention that the trial court erred in failing to apply the presumption of paternity to their intact marriage, the court looked to the purpose of the presumption, which it found to be the preservation of marriages, and recognized that the presumption only applies where that policy would be advanced by the application. The court further acknowledged that, while "the presumption may be rebutted by clear and convincing evidence of a husband's non-access, impotency, or sterility, the presumption is irrebuttable where the mother, the child, and the husband live together as an intact family and husband assumes parental responsibility for the child." *B.C.*, slip op. at 7 (quoting *B.S.*, 728 A.2d at 1034).

The Superior Court reasoned that, when determining whether the policy of preserving marriages is advanced by application of the paternity presumption, courts have looked to whether the marital couple stayed together or separated. It observed that, in *Strauser v. Stahr*, 726 A.2d 1052 (Pa. 1999), upon which Appellants relied, there were factual similarities with the instant case, such as the mother therein had sexual relations with both prospective fathers around the time of conception, the mother had held out the non-spouse as the father of the child, and the husband displayed varying levels of acquiescence relating to the relationship the non-spouse shared with the mother and the child. Nevertheless, the court found one critical difference between the cases — the marital couple in *Strauser* never separated; thus, the marriage remained intact and warranted the presumption of paternity to protect the "basic and foundational unit of the family." *B.C.*, slip op. at 8 (citing *Strauser*, 726 A.2d at 1055). This case is distinguishable, the court held, because Appellants separated on three occasions, including during the period when Child was conceived, albeit, like the couple in *Strauser*, Appellants reconciled and were together at the time of the paternity litigation and thereafter.

The court found the instant case more akin to *B.S.*, *supra*, where the presumption was held not to apply to a couple whose marriage was intact at the time of the litigation because there was no real dispute that the third party was the biological father; the third party's custody petition would not harm the marriage because the couple had reconciled and endured; and application of the presumption could have a "deleterious effect" on the family if the child later discovered that her true parentage was not what she was led to believe. *Id.* at 10 (citing *B.S.*, 782 A.2d at 1036-37). Appreciating that paternity cases each involve unique facts, the court relied upon *B.S.*'s holding that the presumption was inapplicable there because the marital couple, while separated, "voluntarily gave up the

benefit of the presumption for approximately one year after which they claimed the benefits of its existence for the first time." *Id.* (citing *B.S.*, 782 A.2d at 1037).

Similar to the ruling in *B.S.*, the court noted its prior holding in *J.L.*, *supra*, wherein the marital couple separated, with the mother moving into her own apartment, but had purportedly reconciled by the time the paternity action was litigated, and the court held that the presumption did not apply because the mother sought to invoke the presumption only to defeat the third party's paternity action. The court explained that, as in *B.S.*, the court in *J.L.* held that the couple had voluntarily given up the presumption during the separation. By contrast, the court opined that, in *E.W. v. T.S.*, 916 A.2d 1197 (Pa. Super. 2007), the presumption of paternity was applied because, like in *Strauser*, the parties never separated, nor was a divorce complaint filed. Recognizing that this Court has not spoken on the weight to be given marital separations in paternity actions, the court below emphasized that our decisions have recognized a somewhat narrowing trend in applying the presumption of paternity. *B.C.*, slip op. at 12-13 (citing *Brinkley*, *supra*; *K.E.M. v. P.C.S.*, 38 A.3d 798, 809 (Pa. 2012)).

Ultimately, the Superior Court reiterated the trial court's position that the presumption of paternity was inapplicable where Appellants' marriage did not require the protection that the presumption affords. The court relied on the fact that Appellants maintained that their marital difficulties only made their marriage stronger and demonstrated their intent to stay together regardless of the outcome of the genetic testing. The court further emphasized Husband's desire to stay in the marriage, notwithstanding that Mother was intimate with both him and B.C. during the time when Child was conceived, Mother and B.C. lived together for at least four months after Child's birth, and Mother held Child out as the son of B.C. during that time.

Determining that the common factor in the aforementioned cases was that the presumption applied only where the parties never separated, the Superior Court concluded that Mother and Husband "gave up the benefit of the presumption" when they separated three times, particularly considering that, during one of those separations, Mother lived with B.C. and they raised Child together. *Id.* at 14 (citing *B.S.*, 782 A.2d at 1037). Thus, the court held that the trial court did not abuse its discretion by holding that the presumption of paternity was inapplicable.

Additionally, the court held that the trial court did not abuse its discretion by rejecting Appellants' contention that B.C. was estopped from seeking a paternity test, a claim not at issue in this appeal. The court observed that estoppel is merely the legal determination that, because of a person's conduct, such as holding a child out as his own, the person will not be permitted to deny parentage. Observing that the underlying policy concerns regarding the doctrine of estoppel did not arise in this case, the Superior Court held that it was within the trial court's discretion to deem the doctrine of estoppel inapplicable.

This Court subsequently granted Appellants' petition for allowance of appeal to address "[w]hether the lower courts erred in placing paramount importance on periods of separation in determining that the presumption of paternity was inapplicable, despite the marital couple's reconciliation which predated the third-party's paternity action." *B.C. v. C.P.*, 300 A.3d 321 (Pa. 2023) (order).[7]

### III. Parties' Arguments

---

[7] An appellate court reviews a lower court's paternity determination for an abuse of discretion. *H.Z. v. M.B.*, 204 A.3d 419, 425 (Pa. Super. 2019). This Court's determination of whether the lower courts properly interpreted our case law regarding family intactness is a question of law, over which our standard of review is *de novo* and our scope of review is plenary. *K.E.M.*, 38 A.3d at 803.

Appellants contend that the lower courts erred as a matter of law by holding that separation by the marital couple prior to the filing of a paternity action constitutes a *per se* basis upon which to conclude that the family unit is not intact for purposes of applying the presumption of paternity. After canvassing myriad decisions of this Court, which considered the intactness of the family for purposes of applying the presumption, Appellants conclude that this Court has never expressly held that a temporary marital separation, which occurs prior to the paternity challenge, may serve as the basis to hold that the family unit is not intact. They contend that the lower court decisions suggesting that a prior marital separation is a dispositive factor misinterpret this Court's rulings.[8] Appellants submit that a careful reading of this Court's case law demonstrates that a marital separation prior to the litigation of the paternity action, if not mere *dicta*, is, at best, only one factor in the Court's overall consideration of the parties' marital history when conducting a family intactness inquiry.

Appellants rely, as they did in the lower courts, on this Court's decision in *Strauser*, and argue that the Superior Court erred in distinguishing that case on grounds that the marital couple there never separated. In *Strauser*, Appellants point out, the mother of the child had acknowledged paternity by a third party, a blood test had confirmed that paternity, and the mother held the child out as the son of the third party. Nevertheless, they contend, the Court recognized the serious difficulties that the marriage had overcome, and applied the presumption, finding that its application "serves its purpose by allowing husband and wife, despite past mistakes, to strengthen and protect their family." *Strauser*, 726 A.2d at 1056. Appellants argue that the crux of the *Strauser* decision was not that the couple remained married and never separated, but that the marriage survived

---

[8] Appellants do not specifically address the Superior Court rulings in *B.S.* and *J.L.*, *supra*, upon which the lower courts' decisions were based.

due to the couple's choice to preserve it and raise their family together, which conduct fell under the limited set of circumstances under which the presumption not only applies, but is irrebuttable. They assert that the same is true here, as they decided to stay together and have been successfully raising their family, notwithstanding their temporary separations prior to the filing of the paternity action. In direct contradiction to *Strauser*, Appellants maintain that the lower courts used the strength of their marriage against them by reasoning that, because they overcame their marital difficulties and cultivated a strong marriage, the presumption was inapplicable.

Emphasizing that the presumption of paternity remains one of the strongest presumptions known to Pennsylvania law, and that its underlying public policy furthers the preservation of marriages, Appellants submit that the trial court should examine whether a marriage is intact as of the time that paternity is challenged by a third part*y*, *despite* the difficult circumstances which gave rise to a paternity action. *See* Appellants' Brief at 21 (citing *Brinkley*, 701 A.2d at 181 (conducting the family intactness inquiry as of the "time of the complaint for support")).

Conceding that more recent case law has limited the application of the presumption in light of changing cultural norms, Appellants conclude that the presumption retains its vitality, and is irrebuttable where, as here, the trial court makes a factual finding, supported by the record, that the marriage is strong, as the marital couple overcame the significant obstacles which led to the paternity action. Accordingly, Appellants request that we reverse the judgment of the Superior Court and remand the case to the trial court with instructions to grant their motion to dismiss B.C.'s paternity action based upon the presumption of paternity.

As indicated above, B.C. has not filed an appellate brief in this Court, or in any way participated in this appeal.

## IV. Analysis

The presumption that a child born to a married woman is the child of the woman's husband has been a part of our common law for centuries, and has been characterized as "one of the strongest [presumptions] known to the law." *Cairgle v. American Radiator & Standard Sanitary Corp.*, 77 A.2d 439, 442 (Pa. 1951). This legal doctrine was originally referred to as the "presumption of legitimacy" because it was intended to shield a child from the stigma attached in the past to illegitimacy, which subjected the child to significant legal and social discrimination. *John M. v. Paula T.*, 571 A.2d 1380, 1383 n.2 (Pa. 1990). After the General Assembly eliminated this concern by enacting legislation in 1971 which abolished the legal distinction between "legitimate" and "illegitimate" children, the Court referred to the presumption as the "presumption of paternity." *Id.*

The presumption of paternity has a second policy justification, which remains today and is at issue in this appeal, relating to the preservation of the marriage and the family unit. *See O'Brien v. O'Brien*, 136 A.2d 451, 453 (Pa. 1957) (holding that the presumption of paternity "is essential in any society in which the family is the fundamental unit"); *John M.*, 571 A.2d at 1386 (emphasizing in a paternity case that "[t]here is, in short, a family involved here," and recognizing that a married couple living together and raising their children "have obvious interests in protecting their family from the unwanted intrusions of outsiders (even ones who have had serious relationships with the mother, father, or children)"); *Jones v. Trojak*, 634 A.2d 201, 206-07 (Pa. 1993) (conversely finding that the presumption of paternity was overcome where "no intact family considerations were present," and the marital couple "repudiated their marriage vows long ago");[9] *Fish v.*

---

[9] This Court in *Jones* recognized that the phrase "intact family" had been described in lower court decisions as "a situation where the presumptive father and natural mother live together as husband and wife and accept the responsibility of parenthood." 634 A.2d at 206 n.8.

*Behers*, 741 A.2d 721, 723 (Pa. 1999) (reiterating that the policy underlying the presumption of paternity is the preservation of marriages).

Traditionally, the presumption of paternity could only be overcome by clear and convincing evidence establishing that the husband did not have access to his wife during the period of possible conception, or that the husband was impotent or sterile. *John M.*, 571 A.2d at 1384. Indeed, the presumption has been held to be otherwise irrebuttable when a third party seeks to assert his own paternity as against the husband in an intact marriage. *Id.* at 1388-89. However, under certain circumstances, the distinct doctrine of paternity by estoppel may apply, and involves a legal determination that, because of a person's conduct, such as holding a child out as his own, the person, regardless of his biological relationship with a child, will not be permitted to deny parentage, nor will a child's mother be permitted to sue a third party for support, claiming that the third party is the biological father. *Freedman v. McCandless*, 654 A.2d 529, 532-33 (Pa. 1995).

The landscape of the common law governing the presumption of paternity significantly shifted, however, in 1997, when this Court decided *Brinkley*, *supra*. There, Lisa and George Brinkley were married when their daughter was conceived, although Lisa testified that she was not having sexual relations with her husband at that time, and, instead, was having sexual relations with Richard King. When George learned that Lisa was pregnant with King's child, George filed for divorce. King visited Lisa and the child each week for nearly two years, until Lisa filed a complaint for support against King. In defending against Lisa's paternity claim, King argued that the presumption of paternity applied because the child was born during the marriage of Lisa and George, and Lisa had failed to rebut the presumption that her husband was the child's father. The trial court agreed with King that the presumption applied, and that Lisa was precluded from seeking support from King. The Superior Court affirmed.

This Court granted allowance of appeal to review the way in which the presumption functions. Ultimately, in a divided opinion, we vacated and remanded. The Opinion Announcing the Judgment of the Court ("OAJC"), authored by Chief Justice Flaherty, initially opined that the presumption of paternity and the doctrine of paternity by estoppel embody the two great fictions of paternity law: "the presumption of paternity embodies the fiction that regardless of biology, the married people to whom the child was born are the parents; and the doctrine of estoppel embodies the fiction that, regardless of biology, in the absence of a marriage, the person who has cared for the child is the parent." 701 A.2d at 180. Thus, the OAJC explained the pertinent legal analysis in paternity cases was twofold: (1) the court considers whether the presumption applies to the facts presented; if it does, the court determines whether the presumption has been rebutted; and (2) if the presumption has been rebutted or is inapplicable, the court then examines whether estoppel applies, which may bar either a plaintiff from making the claim or bar a defendant from denying paternity. *Id.*

Questioning the wisdom of the presumption's application due to dramatic societal changes that had arisen since the presumption was created, concerning not only the nature of the relationship between men and women, but also the commonality of separation, divorce, and children born out of wedlock, the OAJC broke with precedent and limited the use of the presumption to cases where the policy underlying the presumption is furthered, rendering the presumption otherwise inapplicable. *Id.* at 180- 81.[10] The OAJC expressly defined the public policy supporting the presumption of paternity as "the concern that marriages which function as family units should not be

---

[10] Four members of the Court agreed that the presumption's application is limited to cases where its underlying policies are furthered, as Justice Cappy joined the OAJC, and Justice Newman's concurring and dissenting opinion, in which Justice Castille joined, expressly agreed with this portion of the OAJC.

destroyed by disputes over the parentage of children conceived or born during the marriage." *Id.* at 180.

Concluding that there was no marriage to protect under the facts presented in *Brinkley*, as the parties had separated before the child's birth and were divorced at the time the support complaint was filed, Chief Justice Flaherty opined that the "presumption of paternity, therefore, has no application to this case, for the purpose of the presumption, to protect the institution of marriage, cannot be fulfilled." *Id.* at 181. Having concluded that the presumption of paternity was not applicable, the OAJC remanded for a hearing on the issue of estoppel.[11]

---

[11] Several responsive opinions were filed in *Brinkley*, proffering distinct ways by which to remediate the harsh results of the presumption's application in the modern age. Justice Zappala concurred in the result, opining that, instead of limiting the presumption's application, he would have expanded the means of rebutting the presumption by defining "non-access" to the wife more broadly to include testimony establishing that no sexual relations occurred during the period of conception.

In his concurring and dissenting opinion, Justice Nigro agreed with the Court's remand, but would have adopted an approach permitting trial courts to decide paternity issues on a case-by-case basis, unburdened by the application of a presumption or estoppel theory, where the court would be permitted to weigh the relevant evidence, including blood test results and concerns of an existing family unit, to reach an equitable result.

Finally, Justice Newman filed a concurring and dissenting opinion, joined by Justice Castille, in which she asserted that the presumption of paternity "has lost its place in modern society, especially considering the scientific testing available both to prove and disprove paternity." 701 A.2d at 185. (Newman, J., concurring and dissenting). In Justice Newman's view, the presumption conflicts with the Uniform Act on Blood Tests to Determine Paternity, 23 Pa.C.S. § 5104. Justice Newman interpreted Section 5104 as expressly permitting the use of blood tests in any case where paternity is a relevant issue, and allowing the presumption to be rebutted by such blood testing. (The application of Section 5104 was never raised in the instant case in the lower courts or before us.) Lastly, Justice Newman disputed the OAJC's narrow definition of "non-access" to the wife, and would hold that lack of sexual intercourse is sufficient to overcome the presumption. 701 A.2d at 186.

This historical background of the presumption brings us to the cases relied upon by Appellants and the lower courts in this appeal. In *Strauser*, *supra*, Timothy Strauser filed a custody complaint, asserting that he was the father of the youngest of the three children born to April and Steven Stahr, as demonstrated by blood tests voluntarily submitted by April, the child, and Strauser. April and Steven invoked the presumption of paternity to defeat Strauser's claim. The trial court found that: April and Strauser had sex on at least one occasion during the time of the child's conception; April was also having sex with Steven during that time; April and Steven were married when the child was conceived and born, and remained married without ever separating; April had held the child out to the community as Strauser's child, and promoted his relationship with the child; and Steven exhibited an attitude of indifference toward April and the child.

The trial court held that April, having held out her child to be Strauser's and having voluntarily submitted to blood testing, was equitably estopped from contesting the child's paternity. The court also admitted the blood tests into evidence, and concluded that the presumption of paternity was overcome. The Superior Court reversed, holding that the presumption of paternity applied and was irrebuttable because the family had remained intact. This Court affirmed.

Acknowledging that the presumption of paternity had been criticized in *Brinkley,* the Court found the facts in *Strauser* to be distinct, as "the marriage into which [the child] was born continues." *Strauser*, 726 A.2d at 1055. The Court emphasized that, "despite the marital difficulties that they have encountered, [April and Steven] have never separated," and, "[i]nstead, they have chosen to preserve their marriage and to raise as a family the three children born to them," including the child at issue. *Id.* Accordingly, we held that the case fell within the limited circumstances under which, according to the

*Brinkley* plurality, the presumption of paternity continued to apply, and was, in fact, irrebuttable.

Notably, in rejecting Strauser's claims that April and Steven Stahr did not enjoy a traditional marriage and family unit because, *inter alia*, the couple had experienced conflict caused by adultery, and April represented to others that Strauser was the child's father, the Court found that such assertions were "not unique," as they indicated that the Stahrs' marriage, like many, "encountered serious difficulties." *Id.* at 1056. The Court declared that it "is in precisely this situation, as was suggested in *John M.*, that the presumption of paternity serves its purpose by allowing husband and wife, despite past mistakes, to strengthen and protect their family." *Id.* Thus, finding that the presumption was applicable and irrebuttable, the Court deemed unavailing any reliance upon an estoppel theory.[12] [13]

This Court has not before entertained a case like the instant appeal, where the marital couple had separated prior to the filing of the paternity action, but reconciled by the time the action was litigated. In *B.S. v. T.M., supra,* upon which the lower courts relied, the Superior Court examined a somewhat similar factual scenario, and concluded that the presumption of paternity did not apply. As in this appeal, the marriage at issue

---

[12] As in *Brinkley*, Justice Nigro filed a dissenting opinion setting forth his position in favor of a case-by-case approach to paternity cases unburdened by the application of the presumption of paternity. Similarly, Justice Newman filed a dissenting opinion in which Justice Castille joined, opining that, while the presumption applied because the marriage had been intact at all relevant times, she would find that the presumption was rebutted by the blood test results, which indicated the identity of the biological father.

[13] The Superior Court applied our holding in *Strauser* in *E.W. v. T.S., supra*, and held that the presumption of paternity applied because the marriage was intact, as the couple never separated, no divorce complaint was filed, and the mother's husband fulfilled the duties of a father in connection with the child's birth and religious rites. *E.W.*, 916 A.2d at 1204. The court reached this conclusion, notwithstanding that the wife had represented to the friends and family of her paramour that the child belonged to him.

in *B.S.* was purportedly intact at the time of the third party's paternity filing, and the husband testified to his willingness to continue to live as an intact family unit, despite his wife's infidelity. Nevertheless, the Superior Court declined to apply the presumption, and rejected the marital couple's reliance upon *Strauser* on grounds that the parties there never separated and were an intact family at all times. Conversely, in *B.S.,* the couple had separated for approximately one year from the time of the child's conception until after her birth, during which time the mother acted as though the separation was permanent, and T.M., her paramour, undertook parental responsibilities.

In finding that application of the presumption would not further its underlying policy of protecting marriages from the effects of disputed paternity, the *B.S.* court first reasoned that there was no real dispute as to the identity of the child's father, considering that the mother left the marital home after learning she was pregnant; she filed for divorce; she and T.M. looked to purchase a home together; T.M. was present for the child's birth and was listed as the child's father on a paternity acknowledgement form; and T.M. participated in the child's baptism ceremony and added the child to his health insurance.[14]

Second, the court held that the marriage would not be harmed if the court declined to apply the presumption because the "hellish marital situation" had already occurred, as the parties had acknowledged the extramarital affair, the subsequent birth of the child, the marital separation, and the mother holding out T.M. as the father of child. *B.S.*, 782 A.2d at 1037. Third, the court held that application of the presumption could actually have a deleterious effect on the family, particularly the child, who could suffer greater trauma if she later finds out, due to the public nature of the separation, that the truth of her parentage is different from what she had been led to believe. Concluding that the mother

---

[14] Paternity testing was performed and the results of the test were known only to the parties. *B.S.*, 782 A.2d at 1031-32.

and her husband "voluntarily gave up the benefit of the presumption for approximately one year after which they claimed the benefits of its existence," the court found that any damage to the marriage was "water under the bridge," as the couple had reconciled with complete awareness of the events that occurred. *Id.* Accordingly, finding that application of the presumption would not further the policy of protecting the marriage, the court held that the presumption did not apply.

The Superior Court relied upon *B.S.* in its subsequent decision in *J.L. v. A.L.*, *supra*, to conclude that the presumption of paternity was inapplicable. In *J.L.*, the marital couple was experiencing difficulties and the mother ultimately moved into a separate apartment, although the couple did not file for divorce, and continued to have sexual relations. The mother engaged in an extra-marital affair with J.L., and became pregnant, after which J.L. assumed the responsibilities of an expectant father, and mother and J.L. presented themselves to others as a couple preparing for the birth of their child. The mother gave birth while still married, and listed her husband as the father on the child's birth certificate. While all parties later became aware that a prenatal paternity test indicated that J.L. was the biological father of the child, the mother held out both J.L. and her husband as the child's father, depending upon the company she was keeping at the time, and both men assumed parental duties. After the relationship between the mother and J.L. ceased, the mother no longer permitted J.L. to see the child.

After J.L. filed a paternity action, the marital couple invoked the presumption of paternity, asserting that they had never separated or filed for divorce, and that their marriage had remained intact. At the hearing, both the mother and her husband testified to that effect, with the husband expressing his desire to stay with his wife, despite her lies and deception regarding the paternity of the child. Unlike the instant case and *B.S.*, however, the trial court expressly discredited the mother's testimony regarding the status

of the marriage, concluding, instead, that the marriage was a façade, created by the marital couple to keep J.L. out of the child's life. Accordingly, the trial court held there was no need to apply the presumption to preserve the marriage. The Superior Court affirmed, declining to disturb the trial court's credibility determinations and holding that the record supported the trial court's conclusion that the presumption of paternity did not apply because the marriage did not require protection. Further, emphasizing that the child has been publicly held out as the child of J.L., the court opined that, as in *B.S.*, there is the potential for a negative impact on the family if the presumption were applied and the child were to later discover her true paternity.

Our review of the relevant case law instructs that both this Court and the Superior Court have followed the trend of narrowing the application of the presumption of paternity over the years to reflect more accurately the societal realities of the times. This Court's decisions, however, have held steadfast that there is a single circumstance under which the presumption of paternity continues to apply, and, indeed, is irrebuttable – where there is an intact marriage to preserve. In this appeal, the trial court found that Appellants are living together with Child as a family, and their marriage is strong, notwithstanding the multiple contentious periods of separation that the couple endured.[15]

The record supports this finding, as Mother testified that she and Husband had reconciled prior to B.C.'s filing of the paternity action,[16] and, by the time the paternity hearing was conducted on April 11, 2022, the couple had remained together for 15

_____

[15] Admittedly, it may well be a rare case where a marital couple, such as Appellants, have temporarily separated multiple times prior to the filing of the paternity action, and yet demonstrated to the trial court that they have overcome their marital difficulties to such an extent that rendered their marriage stronger than before the infidelity occurred.

[16] The record establishes that Mother and Husband reconciled and lived together since January 13, 2021, and B.C. filed his action more than seven months later, on August 27, 2021.

months. During that time, Mother explained, she and Husband were doing very well raising their son, Husband was "truly a great father," and she did not contemplate any future separations because the marriage was working. N.T., 4/11/2022 at 39, 42. Husband corroborated Mother's testimony, expressed his love for Mother and Child, and confirmed that the trials and tribulations of the marital conflict, which resulted in the parties' prior separations, ultimately made their marriage stronger. *Id.* at 59-60. When questioned whether the injection of a third party as an additional parental figure to Child would impact his family unit, Husband responded, "[d]efinitely," finding the proposition "utterly preposterous." *Id.* at 59.[17]

Rather than finding that the presumption of paternity applied to protect Appellants' existing strong marriage from the adverse effects of the paternity dispute, the lower courts reasoned that the marriage was *so strong* that it did not require the protection the presumption affords. We reject this legal theory, originally espoused in the Superior Court's decision in *B.S.*, and later referenced in that court's decision in *J.L.*, as it cannot be reconciled with this Court's decision in *Strauser*, which held that the presumption of paternity applies precisely in this situation – where the evidence establishes that a marriage and resulting family unit have overcome the seemingly insurmountable odds and remained together after marital infidelity. Logic dictates that the presumption offers little protection against the heart-wrenching revelations and resulting personal devastation, many times public in nature, that may arise prior to and during the litigation of a paternity dispute, as some, if not all, of these damning events may have already occurred by the time the court is examining whether the presumption applies. The

---

[17] This testimony undermines the trial court's specific finding that "the parties testified that the court's determination will not affect the marriage." Trial Court Opinion, 5/27/2022, at 8. A review of both Husband's and Mother's testimony fails to reveal any other testimony in support of the trial court's specific conclusion in that regard.

presumption, however, additionally protects against the potential insertion of a third party into the functioning family unit upon resolution of the paternity action. This protection is warranted whenever the court finds, and the record supports the finding, that an intact marriage exists.

Thus, the "water under the bridge" construct, employed to preclude application of the presumption where the marital couple already acknowledged the effects of the paternity litigation, is simply inapt, as it views the protection afforded by the presumption too narrowly. See K.E.M., 38 A.3d at 809 ("The legal fictions perpetuated through the years (including the proposition that genetic testing is irrelevant in certain paternity-related matters) retain their greatest force where there is truly an intact family attempting to defend itself against third-party intervention."). Accordingly, the lower courts erred to the extent they relied upon this reasoning in determining that the presumption of paternity was inapplicable in the case at bar.

The lower courts, however, additionally found that the presumption of paternity did not apply because of Appellants' multiple separations prior to the filing of the paternity action. To be precise, the trial court found that the marriage was strong at the time of the paternity hearing, but was not "intact" for purposes of applying the irrebuttable presumption due to Appellants' separations, which occurred prior to the filing of the paternity action. Neither the trial court nor the Superior Court substantively relied upon the strength of Appellants' marriage at the time of the paternity hearing when conducting the family intactness inquiry; instead, as explained supra, the courts utilized their current marital strength to find the presumption's application unnecessary.

Distinguishing Strauser on grounds that the marital couple there never separated, the Superior Court in B.S. declined to apply that decision, holding instead that the marital couple "voluntarily gave up the benefit of the presumption for approximately one year

[when they separated] after which they claimed the benefits of its existence for the first time." *B.S.*, 782 A.2d at 1037. The Superior Court below followed *B.S.'s* reasoning and concluded that Appellants likewise gave up the benefit of the presumption by separating multiple times. Again, we respectfully disagree. In *Strauser*, as detailed above, the mother of the child had acknowledged paternity by a third party, and held the child out as the son of the third party – actions which directly conflict with the presumption that a child born in a marriage is a child of the marriage. Nevertheless, we did not hold that the mother's conduct constituted a voluntary relinquishment of the presumption; rather, in *Strauser*, we focused upon the fact that there was a family involved, and that the marital couple chose to preserve their marriage and to raise as a family the children born during the marriage. *Strauser*, 726 A.2d at 1055. Regardless of the mother's conduct, we held in *Strauser* that the application of the presumption of paternity "serves its purpose by allowing husband and wife, despite past mistakes, to strengthen and protect their family," emphasizing that protection of an intact marriage falls under the limited set of circumstances under which the presumption not only applies, but is irrebuttable. *Id.* at 1056.[18]

In short, while not phrased as such, the Superior Court has interpreted *Strauser* as effectively precluding application of the presumption of paternity in any case where the marital couple has temporarily separated. Respectfully, while we agree that a marital couple's prior temporary separation is a factor to consider in determining whether the

---

[18] A similar fact pattern arose in *E.W.*, *supra*, where the Superior Court, pursuant to *Strauser*, applied the presumption of paternity where the couple had never separated or filed for divorce, but where the mother publicly held the child out as the child of a third party to the third party's friends and family.

marriage is intact at the time of the paternity hearing, we hold that such factor is not dispositive.[19]

In summary, we hold that the lower courts erred in concluding that the presumption of paternity was inapplicable on grounds that Appellants' marriage did not require the protection the presumption affords. We further hold that the lower courts, in conducting their inquiry regarding whether Appellants' marriage was intact for purposes of applying the presumption, erred by giving primary importance to their marital separations, which occurred prior to the filing of the paternity action, while giving no substantive consideration to the intact status of their marriage. While such separations and their attendant circumstances are, indeed, relevant to a determination of whether the marriage is intact, they are not dispositive. Accordingly, we reverse the order of the Superior Court, and remand to the trial court with instructions to grant Appellants' motion to dismiss B.C.'s paternity action.

In closing, we reiterate that this appeal does not present the issue of whether the presumption of paternity has outlived its usefulness in light of contemporary standards. Unless or until this Court abrogates the presumption of paternity in a case where that issue is preserved and fully developed, courts in this Commonwealth shall apply the presumption of paternity in the limited circumstance where its purpose to preserve marriage is advanced. *See K.E.M.*, 38 A.3d at 806 n.4 (finding that "[o]ur common-law

---

[19] Of course, the circumstances of each particular paternity case must be reviewed independently and in its entirety, with due regard given to the trial court's findings which are supported by the record. The trial court is free to reject evidence suggesting that a particular marriage is intact, as the factfinder is entitled to weigh the evidence presented and assess the credibility of witnesses. *See J.L.*, 205 A.3d at 356 (trial court expressly discredited the mother's testimony that the marriage was intact and entitled to the protection of the presumption of paternity, concluding, instead, that the marriage was a façade, intended to keep the third party out of the child's life).

decisions are grounded in records of individual cases and the advocacy by the parties shaped by those records").

Order reversed, and case remanded with instructions.

Justices Donohue, Dougherty, Mundy and Brobson join the opinion.

Justice Wecht files a concurring opinion.

Justice McCaffery did not participate in the consideration or decision of this matter.